Honorable the Judges of the United States Court of Appeals for the Fourth Circuit. Ms. Zylstra. I mispronounced. I apologize. You can ask it correctly, your honor. Pleased to hear from you. Good to have you with us. You can take your mask off. Good afternoon, your honors. May it please the court. My name is Ashton Zylstra, and I have the privilege today to be here to represent the appellant, this plaintiff, Justin Brown. This is a case in which the defendant's employees were permitted without sanction to use the n-word in the workplace to make racist, demeaning comments about Black people, to force the sole Black member of the South crew to undertake unsafe tasks and to do dangerous work alone, and to segregate the lone Black member of the crew during morning meetings by purposely giving him his assignment's laugh. And despite this egregious conduct... After he complained about the comments that he didn't hear directly, to your last point about the assignments, didn't they start making an effort actually to give him the assignments first, but then the problem with that was he wouldn't show up as early as everybody else, so they had to assign other people before him until he showed up. So, your honor, in December of 2016, after that complaint had been raised, there was an instruction by Mr. Coffer, who was the head of the DPW at the time, who instructed Mr. Eastland to give Mr. Brown his assignments first. Now, first, that instruction does not resolve this problem. That still segregates Mr. Brown from his White colleagues. It just segregates him in the opposite direction. It still gives him a different treatment from everybody else that has the opportunity to free resentment in the workplace and to demonstrate a distinction... Did he ever complain about getting his assignments first? Your honor, I'm not aware of anywhere in the record where he complained about getting them first. However, he did continuously complain about all of this continued force of conduct, and it isn't a requirement that he complain about every single little piece of that continued force for that entire course to be part of a hostile... In this case, you have a co-worker, who I think his name was Peach, and he made some reprehensible comments, but I thought the record indicated, tell me if I'm wrong, that once the plaintiff complained about that and the employer canceled Peach, there was not a repetition of that. So, your honor, there isn't anything in the record to show any further incidents past March 2016 specifically with those comments. There is another incident in which Mr. Peach used the n-word to refer to Mr. Brown in conversation with Mr. Eastland, but the issue here... Was that after Mr. Brown had left employment? Your honor, I don't have a specific date for that conversation, but that occurred during Mr. Brown's employment. The conversation specifically occurred because Mr. Brown had done something that Mr. Peach was upset about, and in complaining to Mr. Eastland, Mr. Peach referred to Mr. Brown by using the n-word. But going back to your honor's question specifically about whether or not Mr. Peach was canceled, any oral reprimand, if such an oral reprimand did occur, was obviously ineffective in this case because Mr. Peach, the person who supposedly was reprimanded, could not even recall whether that occurred and what it related to. So, we see that Mr. Peach, in his own deposition, says, I've never been counseled. I've never been disciplined regarding anything I've ever said in the workplace. So, regardless of whether or not this happened again, you see that because of that failure of discipline and that failure of proper action, that the institution... So, but if the comments aren't repeated and there's no record evidence that it was or Mr. Brown was ever aware of it, help me understand what the injury is going forward. Of course, your honor. So, here what we have is a pattern of conduct that is like an institutionalized racism within this employer. So, it's not just looking at one act or what one person did. It's looking at everything as a whole. When the employer fails to discipline one employee, what that says to everyone else that works at that place of work is that this conduct is okay. So, you see that even though there isn't anything in the record to show that Mr. Peach may or may not have used the N-word after that date, you do see other racist conduct from Mr. Eastland, for example, that continues to grow because of institutionalized racism. Like what? What is the other racist conduct on Mr. Eastland's behalf? So, your honor, Mr. Eastland had two times commented specifically that he did not want to be around black people, which is a racist demeaning comment. And in addition, he also treated Mr. Brown significantly differently from his white colleagues in a very poor manner. For He specifically segregated Mr. Brown, as discussed earlier in giving his assignments. And he assigned Mr. Brown... Because the overtime was based on where people lived, who was located closer for safety reasons as who got the assignment for whatever the issue was. And correct? That's precisely correct, your honor. Okay, so it wasn't based on his race. And the other giving him assignments last is because he would show up later for the meetings. So he wasn't there in the beginning of the meeting. So he couldn't give him his assignments first. That's not correct, your honor. When you're looking at the record, you see Mr. Eastland being the only person who's saying that there was this issue because theoretically, Mr. Brown was showing up on time. I think he said he wasn't. He didn't say theoretically, but that's his side of the story. And your side is he was showing up on time. Yes, but your honor, you could also look at the testimony of Mr. Peach, who is also defendant's employee, who said, I saw... So did Mr. Brown testify that he showed up on time to get his assignments first? I don't recall if he made that precise statement in the record, your honor. But Mr. Peach made a very similar comment. Well, what did Mr. Brown say? I mean, how did Mr. Brown contradict Eastland on that on the job assignment part? Your honor, I don't recall if he specifically addressed that one concern. However, it is clear in his testimony that in Mr. Brown's point of view, that there was no reason for him to be segregated in that manner, to be pulled apart from his colleagues, nothing that he had done. I don't know if he specifically addressed lateness in particular, but going back to Mr. Peach's testimony, he testified that Mr. Brown was at the meetings, the same as everybody else, and that there was nothing that Mr. Peach had ever witnessed that would justify Mr. Brown being treated differently. Where is that in the JA? Hold on just one moment, your honor. That would be on page 1176. That would be part of Mr. Peach's testimony. So, speaking specifically to the four-part test here in determining whether or not there's a hostile work environment, I'd like to first address the second prong here, as that is where the trial court started a line of errors that carried through the analysis in the third prong and the fourth prong. Specifically, the trial court picked out specific pieces of conduct, especially when looking at Mr. Eastland's conduct, to decide that some of that conduct was not race-based, but some of that conduct was. But when you look at the record, not only is there testimony that contradicts the testimony from Mr. Eastland, the self-entrusted testimony about any non-discriminatory reasons for his actions, but there's also plenty of examples of white colleagues that were not treated the same as Mr. Brown in these instances. And this court very recently just noted that where a plaintiff is treated differently than members of other races is harassed more than members of other races. You were saying he was treated differently on the overtime, on the meeting assignments, anything else? Your honor, it was denied promotion, denied... He wasn't qualified for that promotion. Because that promotion required a certain level of experience that he did not have, correct? And the person who got the job had that level of experience. Well, your honor, in the record it shows that there are at least two instances where there were employees who were hired directly from an ME01 position to an ME03 or higher. And looking specifically at Mr. Eastland, he did have the experience from his... Tell us where that is in the record. So... Go from one to three. So, your honor, there is a reference to Mr. Eastland who skipped multiple levels from ME01 to the crew leader on Joint Appendix 1094, which I believe is in the fourth volume. And on that same page, there's a reference to Norman Downs who skipped between an ME01 position and was promoted directly into an ME03 position as Mr. Brown was seeking to do here. And when you look at... For the promotion versus Mr. Brown who was not qualified because he didn't have the requisite experience, is there an indication that these other people who skipped over the steps that there was somebody else that... That there was nobody that was qualified? Because here there was somebody qualified. Your honor, to first address whether or not he was qualified, Mr. Kinnaman, who was the one who was promoted, was not qualified. He did not... Get the commercial driver's license and he was otherwise qualified by his level of service, correct? When you look at how central that was to the requirements of the position, for example, Mr. Peach, who'd worked... How central which was? The driver's license or the other thing? The driver's license. The ME03 position required operating heavy machinery of a type you couldn't operate without that license. And so Mr. Peach, who'd been working there for 35 years, testified that other than this instance, he had never seen anyone who had been promoted to an ME03 who didn't already have their CDLA license. And Ms. Bratton, who processed the paperwork, noted that... And Mr. Brown had his license? Mr. Brown did have his license, correct, your honor. And Mrs. Bratton noted that the promotion paperwork was improperly filled out because it had to specifically state that he didn't meet the qualifications because of the lack of the CDLA license. And I believe I was mentioning the other instances, your honor, when we were starting to discuss the denied promotion, there was also the denial of the overtime opportunities. And your honor mentioned earlier that it wasn't race-based, it was based on location. But the problem... Well, that's what they said. Yes, your honor. The problem here is that there's at least two instances that Mr. Brown testified to where he was the closest in location, but he wasn't called for the overtime. So those instances where he was the one where policy would dictate... Is that the time when Mr. Eastland said he called him, but he didn't answer? Yes, your honor. When Mr. Brown complained about that to Mr. North, Mr. North talked to both Mr. Eastland and Mr. Brown. Mr. Brown produced his phone records, which did not show any incoming calls, and Mr. Eastland produced his phone, which did show two calls. But most notably, Mr. North was unable to say whether those calls were even in the proper time frame, whether those had anything to do with the overtime at all. So in those instances, and especially concerning to see that Mr. Brown was never called for these overtime opportunities, and there had to be instances where he was the closest. And those policies were specifically put in place for a reason, and the only reason for overlooking it to pass it on to his white colleague is if that conduct was based on race. So why don't we assume that elements met conduct based on race? Tell us why this is severe and pervasive. Your honor, looking at the severe and pervasive prong, this is severe and pervasive because it was frequent, it was continuous, and it was a heinous act. We're talking about specifically with the N-word, the worst racial epithet that can be used in the workplace. With the unsafe machinery, we're talking about putting Mr. Brown... Well, that's an act. I mean, that's, I think that's a different category. How many times and when were the remarks from Mr. Peach? So Mr. Peach, in 2015, made an unknown number of racist comments that Mr. Brown heard about from his colleagues. In March 2016, Mr. Peach again made the same comment, the if any N-word dated my daughter, I would kill him comment. And was that made to Mr. Brown? It was made within Mr. Brown's vicinity. So Mr. Brown did not personally hear it at the time, but he was about 10 feet away. What, how is that hearsay considered? So specifically that hearsay is considered because that was an immediate, it's a statement of a party opponent. First, the statement that Mr. Eastland made, he's a defendant in his case, and his coworkers telling him is a present sense impression of what they just heard from Mr. Brown. That's your theory of admissibility? Your Honor, that was not fully briefed in our briefings here. So if it's hearsay to be considered, it's inadmissible evidence, unless you come up with an exception to the hearsay, right? You've got to have a hearsay rule. And it is our position that depending on which specific comment we're talking about, it would be a present sense impression. And that's the problem you got with a lot of these statements. I'm going to ask you the same question, but I like to explain not only what statements are, but how they're admissible. And in addition, they're also admissible to show how this impacted Mr. Brown, to say that it's not necessarily being admitted for the truth of the matter asserted, but to say that Mr. Brown was told these things, and this is how he perceived this hostile work environment. And it's important to note that Mr. Brown... So he was told these things by somebody other than the speaker about Sam? Correct. The hearsay was repeated to him. That's correct, Your Honor. And then you would show his reaction to it. What exception to that rule? In that specific instance, in March of 2016, that would be the present sense impression excited utterance of his coworker turning around. Mr. Brown could see it on his face that something had just been said, and then being told shortly thereafter, this is what I just heard. This was startling to me. This was unbelievable to me that this was just said. Let me tell you this in the moment. Now, what you're telling us here now is in the record, as Mr. Brown said all that? In the record? Yes, Your Honor. It's talking about specifically... You're quoting your client then on that? Yes, Your Honor. All right. His reaction? Yes, Your Honor. And in addition, Mr. Peach has already admitted to these statements. So those are already in the record as well. For purposes not to belabor this, but for purposes of this particular element, you have Peach making one or more comments in 2015, a comment in 2016, and then there's nothing from him after that. And then you have two comments from Eastland that, assuming the facts in your favor, that were a year apart. Have you got anything else? Yes, Your Honor. All of the other conduct. The segregation during the morning meetings happened on a continuous basis. That was consistent day after day. There was the... But in terms of race-based comments, is there anything else besides those? Not in terms of comment, but in terms of treating Mr. Brown differently because of his race, there's other conduct that's at issue. Your Honors, I believe that I have run out of time. If there are any further questions? No. Thank you. You reserved some time, I think. Thank you very much, Your Honors. We would ask that this Court reverse the decision of the trial court. Thank you. Mr. Levine? May it please the Court, the District Court's grant of summary judgment should be affirmed in this case because Mr. Brown simply failed to present evidence of a racially hostile working environment for race discrimination. And I think importantly, the District Court did not have to make any credibility determination. In fact, the Court's primary source of discrediting Mr. Brown's allegations, his charge of discrimination, his complaint itself, his written discovery answers, the Court's primary source was his own deposition testimony, where one by one, Mr. Brown essentially debunked each one of his own claims. Mr. Brown started with DPW in January of the first of the year. As an ME01, he was cutting grass, maintaining county roads. This is a manual labor position. He had the same supervisor that entire time, Mr. Eastland. And though he alleged in his charge of discrimination that since 2014, he repeatedly complained about all sorts of discriminatory acts. Again, in his deposition, he confirmed that wasn't true, that there were no reports that he made in 2014, that nothing happened in 2014. The entire calendar year, Mr. Eastland didn't say anything that he took as offensive. And the same was true in 2015. Mr. Eastland didn't allegedly make any comments in 2015 or discriminate against him, save this one alleged overtime issue. And it was essentially one instance where there was a snowstorm. Mr. Eastland testified, as Judge Thacker, you pointed out that either the person closest to the incident or closest to the equivalent would be called. And Mr. Brown claimed he hadn't been called and showed his own records to Mr. North. And as I sort of educated him in his deposition, if you call somebody and they don't answer, the cell towers don't connect. So there wouldn't be anything on your log anyway. Mr. Eastland, on the other hand, had missed calls that he was able to show Mr. North. So that's the only thing that he raised in 2015. He didn't say I'm being discriminated against and not given overtime opportunities, which were few and far between as it is. This is not a position where there was consistent overtime and everyone was making a substantial amount of money. Overtime was reserved for major incidents, a downed tree, roads that needed to be cleared. It was unusual. And in fact, under the same supervisor, Mr. Eastland promoted with his supervisor's agreement, Mr. Brown to an MEO2 position in October of 2015. And we discussed it. And though the non-promotion claim was time barred, I think, Judge Thacker, you really hit the nail on the head. There was only one logical person to choose for the position because neither of the two men were completely qualified. Mr. Brown, as you pointed out, did not have the requisite experience. And Mr. Kinnaman, who had 13 years of experience, did not have his class A CDL. And as Mr. Copper, the African-American head of DPW, who was making these decisions, points out in his deposition, I couldn't magically give Mr. Brown more experience. It made sense to give Mr. Kinnaman the promotion. He had the time and service. She gave some examples of others who skipped, didn't have requisite experience and skipped from, you know, one level of experience to another. Do you dispute that? I would say the record's completely undeveloped in that area. It was mentioned in passing in a position that people had heard it had happened, but we don't know when and we don't know what the position descriptions looked like at that time. So for all we know, it could have happened at a time where the county's job description for MEO 3 didn't require any years at MEO 2. The record is just not developed. They didn't take discovery on that. So Mr. Brown did not, does not have sufficient evidence on that point. He has no evidence at all other than some passing remarks without any, you know, context. And so because Mr. Kinnaman had the experience, the county decided to give him six months to get his CDL. And it's sort of interesting, they pointed out in their papers at one point that one of the, one of the things that was evidence of discrimination was that Mr. Kinnaman, Mr. Brown had to drive him to go take him to get his CDL training. And, you know, it's really another example of Mr. Brown sort of subjectively believing that everything is discriminatory or based on race. Mr. Kinnaman and Mr. Brown were friends and were colleagues and this is a small EPW and there was nothing discriminatory about having Mr. Brown drive him to get his CDL. So in 2014 and 2015, there are no problems. And other than this one instance of overtime that, you know, was really sort of a non-issue, we get to 2016. And in 2016, we have the Peach comment in March. And it's obviously vile and indefensible and no one's going to say different. I thought Peach was alleged to have made the same comment some point in 2015, even though Mr. Brown didn't hear it. But I thought there was an allegation that it was said at some point during that year. That's another area where the record is completely undeveloped. That's something where Mr. Brown said in his deposition, people had been coming to me and saying, look out for Peach. He's saying these racist things. There's no further development or evidence in the record about who was saying it, what was said. There's certainly no admissible evidence that any such thing happened. He wasn't able to develop that testimony any further. There's no record of it ever occurring in 2015. Well, your colleague there says it's admissible to show his reaction to it, not for the truth of the statement. Well, he had no reaction to any. Well, he said it would bother him. He's telling them. The 2016 comment. Well, that's some of the incidents. I mean, she says there's an evidentiary rule that would let that in. Well, I don't think there's any evidentiary rule that would allow in him saying in 2015, unnamed people were coming to me and keep just saying racist things. And he didn't testify about having any particular reaction to that. He just says people were coming to me and telling me these things. Nobody was deposed from the crew. Only the supervisors were deposed. So there's nothing in the record from any crew member substantiating that. No affidavits, no depositions, nothing to substantiate that. With respect to the March 2016 comment, though Peach didn't really remember saying it when he deposed. He didn't deny it. He said if that's what they said, I said I must have. And Mr. Copper in his deposition conceded that Peach admitted it at the time. And Mr. Copper, and it's interesting, by the way, when he was asked about his relationship with Mr. Peach in Mr. Brown's deposition, he worked with him very seldom. And he said he really hardly worked with him. This is at 94, the appendix. And he described him as very cordial. And they would was sort of a sign neither here nor there would work with them from time to time. And said he never perceived any hostility from Mr. Peach. So in terms of perceiving his work environment as that Mr. Peach was dangerous or had some disdain for him, Mr. Brown didn't perceive that at all. When this comment was made and it was relayed to Mr. Brown, he said it made him uncomfortable. And I think it's interesting because it underscores how this type of thing wasn't a pervasive thing in the work environment. But the employee that heard it immediately goes to Mr. Brown and says, you're not going to believe what I just heard. I think you should know this. As opposed to just, well, I'm not going to tell him. This is just how we talk. I think it's indicative of the opposite of what Mr. Brown alleges, that this was a widespread practice, about these epithets and slurs. This Caucasian employee was disturbed by hearing it and immediately reported it to Mr. Brown. Mr. Brown goes to Mr. North, the road superintendent. Mr. North immediately reports it to Mr. Copper, though their briefs essentially contend nothing was done. What Mr. Copper did was what he felt was appropriate, which was he gave a verbal counseling to Mr. Peach and said, this won't be tolerated at DPW. And as various members of the there's nothing in the record that indicated it was ever repeated. The other instance referenced came out in Mr. Eastland's deposition. It was the first time Mr. Brown even knew that it happened. He learned about it for the first time after hearing it in Mr. Eastland's deposition. And Mr. Eastland described the only instance he was aware of where Mr. Peach came into an office, was angry about something, and used the N-word in reference to Mr. Brown. He wasn't having a conversation with Mr. Eastland where he knew that this would be acceptable to use this language. He came into the office yelling, and Mr. Eastland happened to be standing there and was shocked by what he heard. So there's no evidence in the record that it was repeated. And I think the district court accurately pointed out that as a matter of law, the discipline was sufficient because there's nothing to indicate it happened again. As to the September 29th Eastland comment, and it's interesting, all throughout their it's been one very specific day. What year are we talking about now? 2016, September 29th of 2016, when Mr. Brown has alleged that Mr. Eastland made the comment, I don't feel like being around black people. Set aside Mr. Eastland's categorical denial of that, that appears in the record as double hearsay. Though he initially contended that he heard it, he conceded at deposition that another employee by the name of Dean Davidson had relayed that to him. Mr. Davidson was never deposed. No affidavit was made for Mr. Davidson. Mr. Davidson is now deceased. So there's no admissible evidence in the record that that comment was ever made. Unless there's some theory of admissibility under the hearsay rule. Unless there is. And at the summary judgment stage, nothing was raised by Mr. Brown suggesting the court could consider it under some exception to the hearsay rule. They simply said, we say this happened. And when in our motion, we said, well, it's double hearsay. You don't have anything for Mr. Davidson to substantiate it. There was no answer. As to the second comment, this was a point in Mr. Brown's deposition where after he realized he couldn't substantiate the fact that the September 29th statement was made by Mr. Eastland, he just sort of did one of these, well, it happened at other times. And tell us when. No information about that. No information about what year Mr. Eastland allegedly made this comment. They were working together for five years, from 2014 through 2018 when Mr. Eastland left for medical reasons. So there's nothing in the record if we say, well, there's a comment he actually heard. He heard Mr. Eastland say this. We have no information about when that happened or what the comment was. He had guessed that, you know, he heard it while he was walking by Mr. Peterson, but there's no development in the record. And so essentially all he has that he can attribute to Mr. Eastland over a five-year period of time, he began in January of 2014. And though Mr. Brown left in 2019, Mr. Eastland left before that and went in October of 2018 because of an injury. That's all he has is an alleged statement by Eastland in September of 2016. That's double hearsay. And this alleged instance of hearing Eastland say it himself with no factual development whatsoever in the record. So in December 2016, Mr. Brown finally goes to Human Resources and says that he's given his assignments last. And they've, I think, mischaracterized this as being segregated. It wasn't segregated. The way the assignments are given is they muster in a break room and there's only eight or nine employees. It varies from time to time. And as Mr. Eastland sees people, he gives out the assignment. And what's interesting is these are manual labor assignments. It's not like they're going out to earn commission and you want to be the first one to get your assignment. I would almost suggest that if he was singled out and given his assignment first, that might be a punishment. If they said to him, Mr. Brown, go cut grass, we're all going to sit and have a cup of coffee for another hour. That isn't what happened. The assignments are as they come in. And when Mr. Brown complained, his own characterization of his complaint was communication issues. And that's at 157 in the appendix. That's what he told HR the problem was, that he has communication issues with Mr. Eastland and doesn't think Mr. Eastland likes him. And that, quite frankly, he doesn't like Mr. Eastland either. He confirmed that at this December meeting, he made no report about being asked to do any type of less desirable or dangerous job. He didn't say, well, he gives me my assignment last and I have to do this horrible, I have to dig ditches and all my colleagues just have to do some light manual labor. They have a much better time. He didn't make any type of complaint. He didn't report any overtime issues in December of 2016. He didn't report any alleged racist comments by Mr. Eastland. And he didn't even bring up in 2016. And in short, he didn't report discrimination. He reported a communication issue and essentially a personality conflict. And as Judge Thacker pointed out, the county attempted to resolve this by having them engage in these weekly meetings where Mr. Eastland was supposed to give him his assignments first. But as Mr. Eastland explained, it really didn't work out long term. It didn't make sense for me to stand there with eight people waiting to get their browns alcohol on his phone. And so they're all, they're all waiting. So he would give the assignments as they come. But it just doesn't plausibly evidence racial discrimination for a hostile working group. They move on to the sort of miscellaneous grievances that occurred in 2017, as I described it, no alleged racist remarks of any kind in 2017. But when we talk about these carefully in its opinion, Mr. Brown conceded he was never instructed to do any of the things that he alleged he had to do by himself. He was asked, well, you alleged you had to take the greater blades off by yourself, a dangerous task. Is that what Mr. Eastland told you to do? Well, no, he just told me to take the greater blades off. Did somebody end up helping you? Yes. In every single instance, he was assisted by somebody else, called Mr. Eastland on a radio at one point, and Mr. Eastland said he would come. Mr. Eastland said he was on his way. He didn't wait for him. Somebody else helped him. So all of these equipment issues are really just a red herring because Mr. Brown himself conceded in his own deposition that he wasn't instructed to do anything dangerous by himself. The other thing they alleged, and they have sort of walked back from it, it appears in charge of discrimination is Mr. Brown says he was disciplined differently than his Caucasian colleagues, that he was subjected to write-ups. And we went through this with Mr. Brown in his deposition, and with the exception of one instance where the director of DPW, Mr. Copper, wrote him up for running over a mattress, Mr. Brown discovered, I think in his deposition when he was presenting with the documents, that in the three instances that he was written up in 2017 and was with a Caucasian colleague, his colleague got the identical discipline. The write-up is literally identical verbatim. The names are different. That's the identical. It went no further than a write-up. There was no loss of benefits or salary or anything along those lines. So the district court walked through each of these categories of evidence very carefully and concluded that none were simply borne out by the record. These weren't racially motivated instances. And though Brown asked the court to ascribe everything that happened to him, every aspect of his job to race, the court accurately realized this was simply a mischaracterization and an exaggeration, and that he was relying essentially on subjective speculation. So within the framework of Title VII, this is nothing like any of the cases this court has seen recently where there were tribal issues. Strothers in 2018, where from day one, the employee was singled out for harassment by her supervisor and fired before he... You sort of make it sound like the judge made findings of fact. I don't think... You said the judge did this and the judge rejected this and the judge did that. The judge was obliged in this setting to take the view most favorable to the plaintiff. Correct. And the only thing the district court did was look at Mr. Brown's testimony instead of his allegations, because that was the conflict. The dispute wasn't between Mr. Brown and the county witnesses. The dispute was essentially between his allegations and his testimony. And the district court didn't resolve, didn't make any factual findings and didn't make any credibility determinations. The district court looked primarily at Mr. Brown. I'm just referring to the way you were arguing it. It sounded to me like you were arguing about a judge at a bench trial. And he made findings about the plaintiff's testimony and this and that. He didn't do that, did he? He had to accept the version most favorable to the plaintiff. Correct. He accepted the version that was essentially Mr. Brown's version from his own deposition testimony. He didn't have to make any specific findings. He was pointing to his own testimony. So this is nothing like Spriggs, where there were incessant racial slurs, epithets, and insults by a supervisor, habitually called the N-word, called things like monkey, just abhorrent things that cannot be tolerated in the workplace. None of those things happened here. Frequent and highly repugnant insults. Boyer-Liberto in 2015, a cocktail waitress who was twice called a porch monkey by her manager, requiring another abhorrent instance. But more akin to purpose. An instance where, frankly, not only is there not sufficient evidence that the workplace was objectively hostile, but there really was no subjective evidence either. Mr. Brown never testified that he really subjectively viewed his workplace as hostile, that any one thing altered how he did things or how he perceived things. He described generally good relationships with co-workers, including Mr. Peach, who made this horrendous comment in 2016, saying, no, we got along fine. He didn't seem hostile to me. We made small talk. I didn't have any issue with that. An employee who was promoted within a year. So the district court saw this case and referred exactly what it is, as Mr. Brown himself described it. Mr. Eastman didn't care for one another. And this is the classic supervisor-subordinate personality. And at the result, it's simply not enough to tell and you have to show. Nor is it sufficient to say, well, I didn't get this evidence in the record at the summary judgment stage, but my luck will improve at trial. Can't do that either. They had a full and fair opportunity to develop the record. And on this record, the district court should affirm, this court should affirm the district court's entry of summary judgment for the appellate. Thank you. Is there any questions? Thank you very much, sir. Ms. Zylstra. Yes, your honor. The first thing I'd like to address. You can take your mask off. Sorry, your honor. The first point I'd just like to address is that it's interesting how counsel tried to downplay what it really meant to have Mr. Brown singled out from his colleagues to be given his assignments last. And that's specifically because two of his colleagues testified specifically that that conduct could lead to a hostile work environment. Mr. Hopper testified that it could be a hostile environment for a black person to always be assigned work last. And Ms. Bratton, who is an HR professional trained specifically on the legal definition of a hostile work environment, conceded that being assigned work last could potentially lead to a hostile work environment. So it's interesting that now they try to downplay it and say, no, no, no, that isn't bad at all. You know, they were all in the same room. No one would have even known. How's that admissible evidence? Your honor, it's. Testifying about legal conclusion. Your honor, it's demonstrative of the objective element of. Are they expert witnesses of some kind? No, your honor. It's, it goes to whether or not that objective test is met in a severe and pervasive test, because what we have here are two reasonable people putting themselves in the place of Mr. Brown, including that hostile work environment is here. And that is the exact question that the court needs to look to when finding that objective test of whether or not a reasonable juror could find in Mr. Brown's place that there was a hostile work environment here. So both of these comments go directly to answering that question. And as your honor pointed out earlier, there are findings of fact that the judge has made down at the trial court level. And specifically, counsel has asked you to make continued credibility determination when he says, well, Mr. Brown testified that he heard this in 2017. You shouldn't believe that. You shouldn't believe what he says. Instead, you should believe what Mr. Eastman says. And that is precisely the type of credibility determination that is not ripe at summary judgment stage. That is a determination that should be determined by the fact finder at trial, whether or not they believe Mr. Brown, when he stands up and says in 2017, I was walking through the yard, and I personally heard Mr. Eastman say, I do not want to be around black people. Now, looking back to the assigned dangerous tax issue. Now, counsel would minimize this issue to just say, well, he wasn't specifically told to do the two-person task on his own. What Mr. Brown was instructed to do, as counsel noted, was remove the greater blade. What Mr. Eastman, his supervisor, did not do was assign assistance. So even if he never said overtly, do it yourself on your own, this unsafe task that everyone has agreed is simply not safe for one person to do alone. What other option did Mr. Brown have? Wasn't there a mechanic that advised that it was safe? Breeding was the mechanic's last name? I believe your honor is referring to the instance where he was driving the greater. Oh, I thought you were talking about the greater. Oh no, your honor. All right, so it's the greater blade. Oh, is that the time when Mr. Eastman said he was going to help him, but Mr. Brown didn't want to wait for him to come and help him, so he did it on his own? That was the time when Mr. Eastman did not assign plaintiff any help at all. From Mr. Plaintiff's deposition testimony, he did not have any help, and he was ultimately helped just by a colleague who serendipitously was passing through the yard at that time. But to your honor's question about the specifically driving the unsafe greater, this is again another point that is only testified to by Mr. Eastman. When Mr. Brown saw these unsafe things on his greater, the bulging tires, the punctures, it happened three different times in the record, Mr. Eastman claimed that he went to Mr. Breeding, and he claimed that Mr. Breeding told him that it was okay. But if that were true, why would it be that Mr. Copper, minutes later, would call Mr. Brown and say, come back, this isn't safe? If a mechanic had checked it, there simply would be no reason for that. And in one instance, the tire even needed to be changed. And your honors, my time is up, so if there are no further questions. We appreciate it very much. Thank you. Appreciate your arguments of both counsel, and if we could do so, we'd come down and greet you and shake your hands in the well of the court. Our court does. This is a general proposition. We're not doing that right now. All the best to you, and we'll take your case under advisement. Madam Clerk, we can adjourn court until tomorrow morning. Honorable court stands adjourned until tomorrow morning. God save the United States and this honorable court.
judges: Robert B. King, G. Steven Agee, Stephanie D. Thacker